United States District Court
District of Massachusetts

```
_____
                               )
UNITED STATES OF AMERICA,      )
                               )
          v.                   )
                               )   Criminal No.
MANUEL SANTIAGO,               )   09-10393-NMG
CARLOS SANTANA,                )
EDWIN RIVERA PIZARRO,          )
OMAR A. CASTRO,                )
CESAR HERNANDEZ,               )
ANGEL L. OLIVERAS,             )
WILFREDO RAFAEL MONTAS,        )
LUIS MIGUEL BAEZ,              )
FELIX RODRIGUES COLON,         )
JORGE RAFAEL RIVERA-LOZADA,    )
FAUSTO NIBAL,                  )
JEAN CARLO VIERA-RODRIGUEZ, and)
ANGELA ORTIZ                   )
                               )
          Defendants.          )
_____)
```

MEMORANDUM & ORDER

GORTON, J.

I. **Background**

This case arises out of a complicated and lengthy drug investigation involving the interception of cellular telephone communications. As a result of that investigation, 14 individuals were charged in December, 2009, with conspiracy to distribute, and to possess with intent to distribute, heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(i).

Pending before the Court are defendants' motions to suppress

evidence. Defendant Angela Ortiz ("Ortiz") moves to suppress the intercepted communications and all evidence derived from them. Seven of her co-defendants, Jean Carlo Viera-Rodriguez ("Viera-Rodriguez"), Omar Castro ("Castro"), Luis Miguel Baez ("Baez"), Carlos Santana ("Santana"), Manuel Santiago ("Santiago"), Cesar Hernandez ("Hernandez") and Felix Rodrigues Colon ("Colon") join in that motion. The government opposes defendants' motions.

## II. Analysis

On December 18, 2009, United States District Judge Rya Zobel issued an Order Authorizing the Interception of Wire Communications ("Wiretap Warrant") authorizing the government to "intercept wire communications to and from" telephone number (857) 919-6508, finding probable cause to believe that the number belonged to a target of the investigation who had used and would continue to use the number to commit narcotics violations. Pursuant to that order, agents intercepted communications which, inter alia, led to the stop and search of Ortiz's vehicle and her arrest.

### A. Motion to suppress wiretap communications

Ortiz moves to suppress the evidence acquired through the wiretap investigation on the grounds that the Wiretap Warrant was defective and the government exceeded its authorized scope. She argues that the Wiretap Warrant was defective because it failed to describe adequately the nature of the communications to be intercepted and the facilities from which they were to be

intercepted. In addition, she argues that the government exceeded the scope of the Wiretap Warrant, which authorized the interception of "wire communications," by intercepting unauthorized "electronic communications."

### 1. 18 U.S.C. § 2518(4)(b)

One of the five items that a court order authorizing a wiretap must specify is "the nature and location of the communication facilities as to which, or the place where, authority to intercept is granted," 18 U.S.C. § 2518(4)(b). Identifying a particular phone to be tapped by its telephone and serial numbers is sufficient to satisfy § 2518(4)(b). See United States v. Cunningham, 113 F.3d 289, 293 (1st Cir. 1997); United States v. Goodwin, 141 F.3d 394, 403 (2d Cir. 1997).

The Wiretap Warrant in this case identified the particular target cellphone by telephone number and IMSI number as well as the name and address of the person to whom it was registered, and thus it satisfied § 2518(4)(b).

### 2. 18 U.S.C. § 2518(4)(c)

In addition, an order authorizing a wiretap must include "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates." 18 U.S.C. § 2518(4)(c). In contrast to physical evidence, future communications

> cannot be described with as much precision, nor can an
> applicant for a surveillance order know of their actual

> content in advance, since it is virtually impossible for an applicant to predict exactly what will be said concerning a specific crime.

United States v. Gambale, 610 F. Supp. 1515, 1538 (D. Mass. 1985). For that reason, this Court has adopted a more flexible, pragmatic reading of the warrant particularity requirement in the context of electronic surveillance. Id. When "a continuing course of criminal conduct is involved, a surveillance order must necessarily be framed flexibly enough to permit interception of any statements concerning a specified pattern of crime." Id.

In this case, Judge Zobel found probable cause to believe that the defendants had committed and would continue to commit a specified pattern of crime: namely, offenses involving the possession and distribution of narcotics in violation of the federal statutes enumerated in the Wiretap Warrant. Pursuant to the specific request of counsel, Judge Zobel went on to describe with particularity the kinds of communications sought to be intercepted:

> [information] regarding the possession and distribution of controlled substances, the identity of the participants and conspirators of the organization, the precise nature and scope of the illegal activity, as well as the relationship between the financiers, manufacturers, suppliers, and distributors or the controlled substances, or the collection and distribution of monies which stem from the illegal narcotics activities and/or finance the illegal drug activities.

By linking discrete categories of communications sought to be intercepted with the particular crimes to which they relate,

Judge Zobel provided clear direction to the executing officers and satisfied the flexible requirements of § 2518(4)(c).

### 3. "Wire" versus "electronic" communications

Ortiz argues that the intercepted communications should be suppressed because the Wiretap Warrant authorized the interception of "wire communications," not "electronic communications." She explains that the communications intercepted in this case did not involve the transfer of the human voice by wire or cable, but rather through binary code by radio wave, which was processed into human speech by the defendants' digital cellular telephones. As a result, she argues, the intercepted calls should be considered "electronic communication[s]," as defined in 18 U.S.C. § 2510(12), and not "wire communication[s]," as defined in 18 U.S.C. § 2510(1).

As in any matter requiring the Court to interpret a statute, the Court must first turn to the language of the statute itself. Tupper v. United States, 134 F.3d 444, 446 (1st Cir. 1998). Title III defines "wire communication," in relevant part, as

> any aural transfer made . . . through the use of facilities for the transmission of communications by the aid of wire, cable or other like connection . . . (including the use of such connection in a switching station).

18 U.S.C. § 2510(1). It defines "electronic communication" as

> any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects

interstate or foreign commerce.

Id. § 2510(12). The two definitions are mutually exclusive. Id. § 2510(12)(A) (explaining that the definition of electronic communication "does not include any wire or oral communication").

At first glance, digital cellphone communications appear to fit within the letter of either definition. As an "aural transfer," or "a transfer containing the human voice," through the use of cellphones by the aid of a network switching station, they could be characterized as wire communications. Nevertheless, cellphone users do emit "sounds" that are transmitted at least in part by "radio" waves, so they could also be interpreted to be electronic communications.

Finding the statute ambiguous, the Court turns to the legislative history to determine whether Congress has expressed a clear intent to include digital cellphone communications within one statutory definition or the other. Tupper v. United States, 134 F.3d 444, 446 (1st Cir. 1998). As the following discussion makes clear, Congress unmistakably expressed the intent to include such communications within the definition of wire communications.

In 1986, Congress passed the Electronic Communications Privacy Act to enlarge the coverage of Title III to include electronic as well as oral and wire communications. Aware that its newly minted statutory definitions could quickly be rendered

obsolete by advancements in cellphone technology, Congress clarified that any transmission of the human voice by phone, whether carried by cable, radio waves or any other new technology, is captured within the statutory definition of "wire communication":

> [A] wire communication encompasses the whole of a voice telephone transmission even if part of the transmission is carried by fiber optic cable or by radio — as in the case of cellular telephones and long distance satellite or microwave facilities. The conversion of a voice signal to digital form for purposes of transmission does not render the communication non-wire. The term "wire communication" includes existing telephone service, and digitized communications to the extent that they contain the human voice at the point of origin, reception, or some point in between.

S. Rep. 99-541, at 11 (1986).  After including cellphone conversations within the definition of wire communications, Congress took care to exclude them from the definition of electronic communications. H.R. Rep. No. 99-647, at 35 (1986) ("As a rule, a communication is an electronic communication if it is <u>neither</u> carried by sound waves <u>nor</u> can fairly be characterized as one containing the human voice."); <u>see also</u>  S. Rep. 99-541, at 13 (1986).  The legislative history thus "makes clear that cellular communications . . . are included in the definition of 'wire communications' and are thus covered by the statute." H. Rep. No. 99-647, at 31 (1986).

For those reasons, Ortiz's claim that the Wiretap Warrant's authorization of the interception of wire communications did not

cover the communications intercepted over the target cellphone lacks merit.

### B. Motion to suppress inculpatory statements and items seized during the traffic stop

In addition to the cellphone conversations themselves, Ortiz moves to suppress the fruits of those conversations, including her inculpatory pre-arrest statements as well as items seized during the traffic stop of her vehicle. Ortiz requests an evidentiary hearing on both matters.

### 1. Items seized during the traffic stop

Ortiz moves to suppress various items seized by police during the course of the traffic stop on the grounds that police lacked probable cause to stop or arrest her and that the search of her vehicle was unreasonable.

A routine traffic stop is justified if an officer has probable cause that the suspect has committed a traffic violation. Whren v. United States, 517 U.S. 806, 810 (1996). If, during the course of a traffic stop, an officer obtains further evidence or information that gives rise to probable cause that the suspect has committed a separate crime, the officer may arrest the suspect for that crime and search the suspect and her vehicle incident to that arrest. United States v. Bizier, 111 F.3d 214, 216-20 (1st Cir. 1997). At any point prior to an arrest, an officer may search a suspect's vehicle without a warrant if the suspect consents to the search. United States v. Dunbar, 553 F.3d

-8-

48, 57 (1st Cir. 2009).

In this case, State Trooper Ronald Solimini observed Ortiz's vehicle swerve after she attempted to make an improper turn. Having probable cause that Ortiz had committed a traffic violation, Trooper Solimini conducted a traffic stop.  He asked for Ortiz's license and registration as well as a few routine questions, measures well within the scope of a traffic stop. After Ortiz gave suspicious responses and failed to provide the vehicle's registration, Trooper Solimini asked her if he could search the vehicle.[1]  Ortiz consented.  The search uncovered 1.933 kilograms of heroin behind the driver's seat, furnishing probable cause that Ortiz committed the crime of narcotics trafficking.  After discovering that evidence, Trooper Solimini arrested Ortiz on the drug charge and the traffic violation.

Ortiz disputes the described chain of events and requests an evidentiary hearing to resolve the disputed facts.  A defendant does not have a presumptive right to an evidentiary hearing on a motion to suppress; rather, a hearing is required only if a defendant establishes that material facts are disputed and that a hearing would assist the Court in resolving the dispute. United States v. D'Andrea, 648 F.3d 1, 5 (1st Cir. 2011).  A defendant's affidavit alone is not cause for an evidentiary hearing if it

---

[1] The inculpatory responses are addressed in Section III.B.2, infra.

contains conclusory allegations, United States v. Southard, 700 F.2d 1, 10 (1st Cir. 1983), and makes no offer of proof with respect to any other facts that might support those allegations, United States v. Calderon, 77 F.3d 6, 9 (1st Cir. 1996).

In this case, an evidentiary hearing is unnecessary. Ortiz's motion to suppress contains a plethora of search and seizure law, but only a scintilla applicable to the instant case.  Moreover, her affidavit in support of her motion to suppress is full of high-sounding legal conclusions, such as "the stop of my motor vehicle was made without reasonable suspicion or probable cause" and "I was questioned in a custodial setting," but is devoid of any detailed factual basis to support those conclusions.  Ortiz does allege that she "did not voluntarily consent to [a] search of my vehicle," but, consistent with the rest of her affidavit, she fails to submit a credible alternative narrative of events and makes no offer of proof that might support her allegation.

In short, Ortiz has failed to make her required threshold showing that material facts are in doubt and a hearing would not assist this Court in resolving the matters at issue.  The record demonstrates that Trooper Solimini had probable cause to stop and arrest Ortiz and that his search of the vehicle fell within the consent to search exception to the warrant requirement.

**2.   Inculpatory statements**

Similarly, her claim that she "was interrogated in a

custodial setting, [and] was not advised of her constitutional right to remain silent," is belied by evidence to the contrary. The arrest report indicates that the arresting officer advised Ortiz of her <u>Miranda</u> rights orally upon arrest and in writing shortly after booking at the South Boston Barracks, where she signed a valid <u>Miranda</u> waiver form with questions written in English and Spanish. While Ortiz contends, "I did not . . . voluntarily waive any of my constitutional rights," her signature appears on the <u>Miranda</u> waiver form and she does not allege in her affidavit that it was forged or in any way improperly obtained.

In addition, the inculpatory statements to which Ortiz appears to be referring were the product of questions posed to her by Trooper Solimini <u>before</u> her arrest during the course of the traffic stop. A routine traffic stop does not implicate the Fifth Amendment unless the officer imposes such a serious restraint on the arrestee's freedom of movement that the stop escalates into a de facto arrest. <u>United States</u> v. <u>Zapata</u>, 18 F.3d 971, 975 (1st Cir. 1994). Relevant considerations include the number of officers present, the degree of physical restraint placed on the subject and the duration and character of the investigation. <u>Id.</u> at 975-76.

In this case, there was nothing coercive or out of the ordinary about the traffic stop that would transform it into a de facto arrest. Trooper Solimini was the only officer present, he

-11-

made no show of force before the official arrest and the nature and duration of the interaction was consistent with a routine traffic stop.  Accordingly, Trooper Solimini had no obligation to inform Ortiz of her Miranda rights until after he arrested her. For those reasons, the inculpatory pre-arrest statements of Ortiz were not obtained in violation of Miranda and will not be suppressed.

## ORDER

In accordance with the foregoing, defendants' motions to suppress (Docket Nos. 140, 143, 147, 148, 149, 151, 152 and 154) are **DENIED** without a hearing.

**So ordered.**

                                                /s/ Nathaniel M. Gorton
                                                Nathaniel M. Gorton
                                                United States District Judge

Dated September 30, 2011